UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID SUTHERLIN,

                    Plaintiff,                    Case No. 2:10-cv-240

v.                                                Honorable Robert Holmes Bell

UNKNOWN DERUSHA, et al.,

                    Defendants.
_____/

REPORT AND RECOMMENDATION

            Plaintiff David Sutherlin, an inmate currently confined at the Baraga Maximum

Correctional Facility (AMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against

Defendant Resident Unit Officers Unknown Derusha, Unknown Patrick, Unknown Bonney,

Unknown Karr, Unknown Bray, Unknown Charlebolies, Unknown Monticello, Unknown Feilding,

Unknown Minroe, Unknown Adams, and Unknown Holman.  Plaintiff alleges in his amended

complaints[1] that he was drugged and sodomized by Defendants Derusha, Patrick and Bonney on

September 23, 2007, by Defendants Karr, Bray and Charlerbolies on August 6, 2008, and by

Defendants Feilding, Minroe, Adams and Holman on August 20, 2008.  On January 3, 2011, the

court dismissed Plaintiff's claims against Defendant Monticello for lack of personal involvement

(docket #17 and #18).  Plaintiff seeks compensatory and punitive damages.

_____

[1]Plaintiff was ordered to file an amended complaint using the proper form on December 7, 2010.
In response to this order, Plaintiff filed three amended complaints (docket #14, #15, and #16),
detailing the allegations.  It appears that Plaintiff used three forms in order to have room to detail his
claims against the named Defendants in the space allowed.  These documents are best viewed as a
single amended complaint.

Presently before the Court are Defendants' Motions for Summary Judgment, pursuant to Fed. R. Civ. P. 56.  Plaintiff has filed responses and the matter is ready for decision.  Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Id.* at 324-25.  The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  The evidence must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  *Muhammad v. Close***,** 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient.  *Anderson*, 477 U.S. at 251-52.  Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

As noted above, Plaintiff alleges that he was drugged and sodomized by Defendants Derusha, Patrick and Bonney on September 23, 2007, by Defendants Karr, Bray and Charlerbolies on August 6, 2008, and by Defendants Feilding, Minroe, Adams and Holman on August 20, 2008.

In their briefs in support of the motions for summary judgment, Defendants state that there is no physical evidence to support Plaintiff's claims and that the record shows that those claims are the product of psychological delusions, paranoia and / or malingering.

Defendants offer a copy of Plaintiff's medical records in support of their assertion that they are entitled to summary judgment. The record shows that on July 11, 2005, Plaintiff was a prisoner at the Oaks Correctional Facility (ECF), and was seen in the Emergency Department at the West Shore Medical Center in Manistee, Michigan, regarding an alleged sexual assault. The Emergency Department report states:

> He begins his history stating that he was "injected with something" and indicates several different hyperpigmented areas of the skin on the right epicondyle, right distal biceps, right olecranon, left first web space of the hand and both lateral ankles. He states he is unsure when all these occurred, they occurred at different correctional facilities and at different times. He thereafter voices his current allegations, explained he went to sleep at 2:00 a.m. and when he awoke at 5:00 a.m. "I had been penetrated." He had no recollection of this but in palpating the anal area it "seems stretched." He makes the assumption that he had received an injection of a hypnotic agent, stating, "I was drugged." He would like a urine drug screen and a full rape kit evaluation.

(Defendants' Exhibit 1A, p. 35.) Examination of the Plaintiff revealed no acute puncture wounds, no ulceration, no raised lesions, or vesicles. In addition, examination of Plaintiff's anus revealed no evidence of abrasion or lacerations. Medical personnel attempted to complete a rape kit and a urine test, but Plaintiff became extremely agitated, "raising his voice in a threatening manner with an accusatory demeanor." This necessitated a termination of the rape kit, as medical personnel felt threatened by Plaintiff's behavior. (Defendants' Exhibit 1A, pp. 35-36.)

Staff at ECF sent a kite for a psychiatric evaluation on December 18, 2005, because Plaintiff again alleged that he had been raped by staff. Under the comment section, it was noted that

Plaintiff had a history of unfounded complaints of sexual assault and that he had been found to be "not mentally ill." (Defendants' Exhibit 1A, p. 54.) Plaintiff was evaluated by Psychologist Brian Majerczyk, M.A., L.L.P., on December 20, 2005:

**Objective:**

"Listen that is bullshit." Inmate pointing to the referral this writer was examining. "I would tell you guys if I was getting raped you know that," Inmate remembering our past interview quite detailed, which took place over 6 months ago. "You were angry that day. I took up some of your holiday time." Inmate referring to the 4th of July and felt that I was angry about working a weekend (required obs coverage) and was inferring that this writer was the angry one, when in fact he was the angry one and I was more irritated in his refusal to talk and problem solve logically. This writer believes inmate is capable of logical problem solving because he is very oriented in all areas and if his unfounded complaints of being raped were removed from the equation you would not suspect any problems, besides some typical anger and irritation inmates go through. He continues to stick to his story, with the exception of this recent referral from inspector and staff. He reported that he was not raped and thinks his Bunkie said that stuff to get him moved. This could be a very likely possibility, especially if inmate informed bunkie of his past alleged rapes. Inmate showing this writer freckles in his ear claiming they were "needle marks." Inmate denied any suicidal/homicidal ideation or intent. "HELL No!" Inmate's memory appeared to be completely intact down to detail that this writer did not remember until reviewing the note. Inmate appeared clean and hygeine [sic] was appropriate. Inmate not satisfied with this writer becuase [sic] he believes I am on the same "team" with the MDOC and will not evaluate him fairly. He wants an outside MD and PSY, "people who are not paid by the MDOC."

**Assessment:**

Inmate does not appear to be significantly mentally ill. At times he reports delusional behavior, which he labels himself which his last alleged rape was last month and occurred in seg. Inmate never has evidence, and if a plan is devised to catch some evidence he will make sure that it will fail. Camera tape will be switched, staff will lie, bunkie will be drugged also...... Inmate's mental status is unremarkable when he fully cooperates. He eats, sleeps and functions in this environment appropriate as far as this writer can tell. It is

- 4 -

unclear what inmate's motives are. It's unclear whether inmate is actually believing himself or his motives stem from a past remark RE: a Lawsuit he is attempting to file against the MDOC. What makes his claims suspicious is he consistently refuses to set up a sting to catch the perp and is unwilling to even try. When this writer attempts to break down his story and clarify each part of it, inmate refuses to participate and today wanted to end the interview. Suicide Risk appeared Low.

(Defendants' Exhibit 1A, p. 55.) Psychologist Majerczyk diagnosed Plaintiff with Delusional Disorder Unspecified Type, Malingering, and Antisocial Personality Disorder. (Defendants' Exhibit 1A, p. 57.)

While Plaintiff was confined at the Ionia Maximum Correctional Facility in December of 2006, he again claimed that he had been raped by staff. Plaintiff asserted that he was raped during the night on December 28, 2006, and was seen by Bryan E. Deeren, R.N., the next day:

**Subjective:**

Pt. called to healthcare after a Request for Service form was received that stated the pt. had been raped by third shift officer last night. He says that this has happened on multiple occasions since coming to this facility and at several previous facilities since the year 2000. He states that he knows that he sleeps heavy and the officers sneak into his cell and inject him with an unknown drug that makes him sleep. He would not tell what officers or specify what previous occasions that he had been raped, but that he had a record of the dates in his cell. He states that he has evidence (pubic hairs, semen) with his family and other evidence with the state police. He states that last night the same officers that always rape him were on duty so he broke a shaving razor blade and wrapped one end with tissue and left the sharp end pointing from the opening of his rectum. He states that when he woke up the razor was in the leg of his pants with blood on it. He states that it was the officer's blood as he was not cut.

**Objective:**

He denied an external trauma or evidence as he claimed that the officers "wash him up" before he awakes from the drug. Prisoner with very serious and animated telling of these events. He stood up from the exam table using wide arm and hand gestures and at one

- 5 -

point his voice became choked as he voiced his frustration with this
ongoing problem.  He presented two pieces of tissue with a small
amount of blood that he stated was from an officer's penis due to the
razor cuts.  He points to several scars that look like needle tract marks
on his hands, anticubital arm and shoulder.  History of delusional
disorder documented in the health record regarding this ongoing
issue.

**Assessment:**

R/O [rule out] rape. R/O delusional disorder.

(Defendants' Exhibit 1A, p. 69.)  Plaintiff was referred to a psychologist and was seen by Jane C.

Nannberg, M.S., L.L.P. on January 3, 2007:

**Objective:**

In session inmate recalled that he claimed to be assaulted by staff and
this led to his observation room status.  He says he is not currently in
any distress and would like to go back to his regular cell.  He was
calm, cooperative, oriented, claims he just wants to "forget about it"
and get back to normal.  This inmate per record has made numerous
allegations of this type in the past.  He was referred to OPT for
delusional disorder in October and was seen by the psychiatrist as not
mentally ill.  He reported he had not been showered in a week, but
has been eating his meals and appears emotionally stable at this time.
Speech is clear, thought clear and organized.  No evidence that he is
responding to internal stimuli.  He has been in several treatment
programs in the past, OPT, etc., last diagnosis was Malingering.  He
denied any suicidal/self-injurious thoughts or intent.

(Defendants' Exhibit 1A, p. 74.)  Plaintiff was diagnosed as having Axis I Primary: Delusional

Disorder Unspecified Type (rule out) and Axis II Primary Antisocial Personal Disorder.

(Defendants' Exhibit 1A, p. 74.)

On January 17, 2007, Plaintiff contacted health care and spoke to Betty J. Kemp,

R.N., stating:

I'm being drugged and sexually assaulted, and sodomized from third
shift officers.  This is happening repeatedly.  The last time was on
1-16-07.  This happens in my cell on the third shift.  I was at the

hospital 12-28-06 for the same thing.  It was covered up.  This has
happened since 2000.  I have needle marks all over from being
drugged.  I was penetrated on 1-16-07.  I woke up and smelled urine
in my rectum.  My prostate is sore.  There is no evidence, I already
washed up.  I need a colonoscopy to check my prostate to see if there
is damage to my prostate.

(Defendants' Exhibit 1A, p. 79.)

Later that day, Plaintiff was seen by psychologist Kirt R. Dozeman, M.A., who

reported:

> **Reason for referral:** Prisoner evaluated once again in response to
> allegations he was drugged and raped by a unit officer.  Similar
> allegations were also made on 12-29-06.  Prior to this a referral to the
> OPMHT was made in October 2006 after prisoner made allegations
> of being raped by unit officers.  A CPE [Comprehensive Psychiatric
> Examination] was completed and prisoner was found not to be
> mentally ill.  In addition to continued allegations prisoner's paranoia
> and agitation appear to be increasing.  Prisoner is adamant that small
> marks on arms and shoulders are proof that he is injected with drugs
> at night while he is sleeping.  Prisoner is increasingly demanding and
> suspicious.  During my interview prisoner demanded the names of all
> officers working in the unit.  Prisoner wanted to know how I was
> contacted and by whom.  Prisoner demanded that he be told exactly
> what this clinician would be documenting on him.  He repeated over
> and over that he is "mentally sound" and for this writer to get [a]way
> from his cell because I was "trying to make [him] mentally ill."
>
> **Previous Psychiatric History (relevant psychosocial history,
> current psychotropic medication and compliance):**
>
> None documented prior to coming to prison.  Since coming to prison
> he has received psychiatric treatment at a CSP, OPT, RTP, HVC etc.
> He was discharged from HVC in January, 2001 with a Malingering
> diagnosis.  More recently he was discharged from RPT @ HVM in
> January 2004 with diagnosis on Axis I: Polysubstance Dependence
> and on Axis II: Personality Disorder NOS.

(Defendants' Exhibit 1A, p. 80.)  Plaintiff's "thought content" were determined to be "delusions"

and his affect was noted to be "agitated - suspicious - paranoid."  (Defendants' Exhibit 1A, p. 81.)

Plaintiff was diagnosed as having a "Delusional Disorder Unspecified Type (rule out)" and an

- 7 -

"Antisocial Personality Disorder." (Defendants' Exhibit 1A, p. 83.) Finally, the psychologist noted

that Plaintiff's "agitation, paranoia and delusional system is increasing." (Defendants' Exhibit 1A,

p. 84.)

On January 23, 2007, Plaintiff complained of intense prostrate soreness. Plaintiff

stated that it felt similar to when he had prostatitis in 2000. Plaintiff asserts that the pain was caused

by "what has been done to" him and requested a colonoscopy. Plaintiff was told that a blood test

was being ordered to check his prostate. (Defendants' Exhibit 1A, pp. 89-90.) On February 13,

2007, Plaintiff was uncooperative and agitated when the psychologist attempted to assess him:

**Subjective:**

…He was referred . . . for a CPE [complete psychological exam] on
1-17-06 and is being monitored by PSU [psychological services unit]
until this is completed. On this date prisoner is arguing with unit
officer about running water in his cell, getting a cotton blanket, and
his insistence to see a Sgt. over unsanitary conditions.

**Objective:**

Seen cell front. Quite demonstrative. Preoccupied with unit officer.
Disorganized cell. Appears angry.

**Assessment:**

Not motivated to disengage with officer and comply with assessment.
Angry. Talkative. Preoccupied with getting his point across. CPE
indicated. Suicide Risk assessed as Low.

(Defendants' Exhibit 1A, p. 93.)

Plaintiff met with the Michigan State Police on February 15, 2007, and discussed this

with Psychologist Dozeman on February 16, 2007. Plaintiff complained that he had more evidence,

but that the police did not want it. Plaintiff also accused Dozeman of being part of a conspiracy to

derail any investigation into Plaintiff's claims. (Defendants' Exhibit 1A, p. 94.) After interviewing

Plaintiff, Michigan State Police Detective Morey stated that Plaintiff's story did not warrant investigation.  (Defendants' Exhibit 3, p. 3 of Inspector Goodson's March 7, 2007, memo to Deputy Warden Norwood.)  On February 26, 2007, Plaintiff the psychologist noted that Plaintiff was very defensive, paranoid, and was generally angry and attacking.  (Defendants' Exhibit 1A, p. 95.)  Plaintiff complained to a nurse that he was raped by staff on February 22, 2007, and February 23, 2007, and wanted to be tested for HIV and Hepatitis.  (Defendants' Exhibit 1A, p. 96.)

On March 2, 2007, Dr. Armando M. Santiago, M.D. completed the CPE, noting:

**Present illness**:

This inmate had previously been referred . . . for psychiatric evaluation that was done in Oct. 2006, for exactly the same alleged sexual assaults.  The perpetrators were reportedly custody officers and also other inmates were involved.  He claimed that he has continuously complained but that cover-up and conspiracy are going on, and nothing has ever come out of his complaints.  Inmate stated that these sexual assaults have been going on since 1998, Assautls [sic] happened in every prison he had been housed, mentioning at least six different facilities he had been to.  Psychiatric evaluation in Oct. 2006 because of almost exactly the same complaint reported that inmate was not mentally ill and polysubstance abuse was seen as the main problem.

(Defendants' Exhibit 1A, p. 97.)  Dr. Santiago noted that Plaintiff has a long history of polysubstance abuse, including marijuana, cocaine, and heroin.  In addition, Dr. Santiago stated:

**Current mental status**:

He was interviewed in telemed.  He appeared to be a well developed, well nourished, black, male, who appeared like his chronological age of forty.  He maintained his basic cooperativeness, although verbalizing some paranoia about the interviewer possibly seeing him as mentally ill when he is totally sane, furtherly [sic] stating that the psychiatrist who had previously interviewed him will vouch for his sanity.  He appeared uptight, edgy but able to maintain . . . acceptable behavior throughout the interview.  Speech was loud and pressured, tend to be overtalkative, and at times difficult to interrupt specifically when talking about the alleged sexual crimes committed against him.

- 9 -

He displayed intense affect, from being irritable to controlled anger. He admitted to angry feeling, the reason goes back to his belief of being sexually abused.  He is not suicidal nor homicidal, no death wish.   The most prominent emotion is suppressed anger for the alleged sexual abused [sic] he has continuously suffered for years.  He is very paranoid and appears to have fixed delusion about being sodomized by different custody officers in every prison he had been to, including the present one.  He rambled on and on about these alleged sexual assault, and the "conspiracies and cover-ups" that followed.  No overt auditory hallucination, but appeared to be having some sort of tactile hallucinations, complaining about soreness in his rectal area on account of the "assaults," and some kind of sensation [sic] from the injections of chemicals forcibly given to him while he was asleep.  He is keeping records/notes, mentioning the exact date of the recent sexual assaults while referring to his notes.  He was focused on discussing these assaults and no other themes were discussed at length.  He appears to be mentally dull but not grossly retarded.  He has no insight at all.  He denies suicidal or homicidal thoughts and not [sic] considered an imminent danger to self or others.

**Clinical summary**:

Patient appears to be suffering from acute delusions/paranoia.  He appeared to have developed a fixed delusion about this alleged sexual assaults (sodomy) perpetrated mostly by correctional officers, happening when he is sleeping at night, and these people giving him injections to successfully perform their evil act.  He becomes sort of verbally threatening when his belief is challenged, and warning the interviewer about possible malpractice action against an erroneous conclusion.

**DSM Diagnosis:**

Axis I:

Primary: Delusional Disorder

Secondary: Polysubstance Dependence

Axis II:

Primary: Personality Disorder NOI

***

**Proposed Disposition and Plan of Service:**

…Start on antipsychotic medication, [i]nvolve in individual and group therapy.

(Defendants' Exhibit 1A, pp. 98-99.)

On March 6, 2007, Plaintiff was seen by psychologist Eric C. Lanes.  Plaintiff challenged Lanes, and asserted that he was not "psychiatric."  With regard to Plaintiff's "current mental status," Lanes noted that Plaintiff presented as "delusional," and that Plaintiff denied "experiencing significant psychological distress beyond his ongoing reported allegations of having been sexually assaulted at numerous MDOC facilities."  Finally, Lanes noted that Plaintiff displayed a good deal of veiled hostility and distrust, and questioned nearly everything that was said to him. (Defendants' Exhibit 1A, p. 106.)

On March 14, 2007, Plaintiff refused treatment.  On March 15, 2007, Plaintiff refused both treatment and medication.   (Defendants' Exhibit 1A, pp. 110-111.)  On March 19, 2007, Donald R. Jager, M.S.W., completed a QMHP (qualified mental health professional) Paneling report which concluded that Plaintiff had a substance abuse history with drug of choice being crack cocaine, that Plaintiff was refusing medications and denied being mentally ill, and that Plaintiff appeared to be uptight, but able to maintain acceptable behavior.  Jager states:

Mr. Sutherlin appears to suffer from acute delusions/paranoia.  He appears to have a fixed delusion about his alleged sexual assaults (sodomy) perpetrated mostly by correctional officers and they happened while he was asleep at night.  He feels that he was being injected in order for others to perform their acts.  He becomes agitated when his beliefs are challenged.  He is a bit of a legalist and threatened legal action if challenged.

(Defendants' Exhibit 1A, p. 112.)

Mr. Jager concluded that Plaintiff suffered from a Delusional Disorder and

Polysubstance Dependence, noting:

> In the opinion of this clinician, prisoner Sutherlin believes what he is
> reporting to be the truth. He cannot fathom the fact that this may only
> be in his head. He denies having a mental illness and/or his needing
> mental health treatment. It is therefore recommended that the unit
> psychiatrist review/evaluation Mr. Sutherlin to see if he needs to be
> treated within the CMHP [Corrections Mental Health Program] and
> or needs to be paneled.

(Defendants' Exhibit 1A, p. 113.)

On March 28, 2007, Plaintiff was evaluated by John F. McCarthy, who stated:

> I SPENT ONE HOUR AND FIFTEEN MINUTES INTERVIEWING
> MR. SUTHERLIN. In the course of that interview we were able to
> resolve some of his delusion.  He was able to acknowledge that what
> he was calling needle marks could also be called dots.  This ability to
> get some distance from his delusion and to see it in another light –
> questions a diagnosis of delusional disorder. I will review his older
> medical records, if I can find them, to learn how his treatment went
> at HVC.

(Defendants' Exhibit 1A, p. 115.)

On April 2, 2007, Plaintiff was scheduled to be voluntarily admitted as an outpatient

in the Corrections Mental Health Program at ICF. (Defendants' Exhibit 1A, pp. 116-117.) However,

Plaintiff revoked his consent to be admitted to the program during a 75 minute interview on that

date:

> Mr. Sutherlin tells me that he got a letter from the United States
> Justice Department saying that they would look into his allegations
> of sexual rape and abuse.  He feels confirmed in the accuracy and
> validity of his allegations.  On at least two occasions in the 75 minute
> interview today he made reference to how much their action makes
> him feel certain about his case.  He mentioned at times having doubts
> about some of the things he claims.  That fact that he can entertain
> doubts about some of what he claims undercuts the idea that these are
> fixed delusions.  The fact that he uses his claims of rape and abuse to
> get himself moved to other prisons where he hopes for better

- 12 -

> circumstances along with his hopes to win a major law suit against the State of Michigan support the idea that there is a lot of secondary gain. At this point I see him as a Paranoid Personality Disorder who occasionally decompensates into a more paranoid and delusional state. The rest of the time he uses his concerns to manipulate his surroundings. I had made out a voluntary application for Mr. Sutherlin. I had thought that he would probably sign in if we promised him no medication and agreed to move him to an RTP. However, since he got the letter from the Justice Department he has lost interest.

(Defendants' Exhibit 1A, p. 118.)

Plaintiff was seen by Psychologist Robin E. Duiker, M.S.W., A.C.S.W., on April 4, 2007. In his report, Dr. Duiker stated:

> Inmate reported the same history of being sexually assaulted by CO's that he has been presenting with in the past few years. He presented with pressured speech as he discussed the alleged rapes and the evidence that he says he has. He told the same points of his story repeatedly and became almost tearful when he was swearing that he was telling the truth. I explained to him that it wasn't an issue that DCH could necessarily deal with because DOC has evidently been following up on his complaints. He did say he talked to a state police officer recently, however he believes that the officer is part of the cover up because he did not want to take the evidence "semen slash urine from my rectum" that he says he has collected. He seemed in distress when he spoke to me about it and was unwilling to accept that he may be delusional.

(Defendants' Exhibit 1A, p. 121.) On April 7, 2007, Plaintiff was interviewed and evaluated for three hours in order to determine if he should be brought into the Corrections Mental Health Program (CMHP). In the report, the psychologist noted that Plaintiff had been complaining that since 2000, officers at six or more different prisons had conspired to rape and harass him. The psychologist further noted that Plaintiff had been found to be mentally ill, but was refusing to cooperate with treatment. The report concludes:

**Current Mental Status**:

Except for his fantastic claims of nightly rapes by officers after being injected with drugs, Mr. Sutherlin is organized, cooperative and able to talk about other things.  When he does talk about the rapes it is usually followed by a plea for understanding how much he is hurting because of these things happening to him.  That is quickly followed by requests for help to make his life better.  I have given him a diagnosis of Paranoid Personality Disorder, because of my sense that at times he does believe his stories.  Others who have evaluated him have felt that they were entire fabrications designed to gain him some benefit from the prison setting.  I also see the manipulative aspect to his claims.

**Clinical Summary**:

Mr. Sutherlin's "delusions" are not fixed.  After about one and one half hours of discussion he was able to admit that the needle marks (where drugs were injected prior to the rapes), looked like red discolorations.  Around an hour later in the interviews he spoke of his own doubts about the accuracy and reality of his complaints.  He quickly backed away from these thoughts saying that the United States Department of Justice had written him to say that they would investigate his complaints.  It was clear that he was thinking about his legal position if the federal government supported his allegations.  The medical record reflects that he has used these allegations to gain single bunking, room changes and facility moves.  He suggested to me that he might sign into the program if I could guarantee that he would go to the RTP at Gus Harrison in Adrian.

(Defendants' Exhibit 1A, p. 123.)

On April 17, 2007, Psychologist Lanes noted that Plaintiff was denying any mental illness and exhibited "[a] good deal of hypervigilence but no clear paranoia or delusional thinking." (Defendants' Exhibit 1A, p. 126.) Plaintiff refused to speak with the psychologist on April 20, 2007, and exhibited hostility towards the psychologist on April 23, 2007.  (Defendants' Exhibit 1A, pp. 127-128.)  On April 24, 2007, Plaintiff sent a kite to health services complaining of "colon pain." (Defendants' Exhibit 1A, p. 129.)  On May 7, 2007, Plaintiff again denied being mentally ill, but information gathered from staff suggested psychotic process.  (Defendants' Exhibit 1A, p. 130.)

On May 15, 2007, Plaintiff requested a colonoscopy. (Defendants' Exhibit 1A, p. 131.) On May 15, 2007, Plaintiff was seen in the unit clinic, but began swearing and shouting during vital signs. Therefore, the visit was terminated. (Defendants' Exhibit 1A, p. 133.) Plaintiff was seen by the psychologist on May 14, May 23, and May 30 of 2007, as well as on June 4 and June 13 of 2007. (Defendants' Exhibit 1A, pp. 132, 134, 138, 143, 148.) On June 7, 2007, Plaintiff told the psychologist to go away and seemed annoyed that he had been awakened. (Defendants' Exhibit 1A, p. 143.) On June 20, 2007, Plaintiff was irritable, defensive and uncooperative, stating that he had gotten "them to throw out that delusional disorder diagnosis." (Defendants' Exhibit 1A, p. 150.)

On July 20, 2007, Plaintiff was transferred to LMF. (Defendants' Exhibit 2.) Plaintiff refused to speak to a psychologist on July 5, 2007, and on July 13, 2007, Plaintiff told the psychologist that his diagnosis was "bogus" and that he had filed a lawsuit regarding the diagnosis. (Defendants' Exhibit 1A, pp. 155, 157.) On July 20, 2007, Plaintiff told the psychologist that he did not want to speak to him. (Defendants' Exhibit 1A, p. 159.) On each visit between July 5, 2007, and November 19, 2007, the psychologist determined that Plaintiff had an Axis II Primary Diagnosis of Paranoid Personality Disorder, but assessed Plaintiff as "not mentally ill." (Defendants' Exhibit 1A, pp. 155-183.)

On November 26, 2007, Plaintiff again claimed that he had been assaulted by staff. Psychologist Paul A. Eyke, M.S., found that Plaintiff had an Axis II diagnosis of Antisocial Personality Disorder and reported:

> Inmate seen cell front in response to HC272 referral. He stated that he was afraid that he was going to die at LMF and claimed he had been contaminated with hepatitis and could not get health care to send him to the hospital to be evaluated. He claimed that he was being assaulted by staff on a routine basis sexually and that this was all in retaliation for the law suit that he has filed. He was unable to identify who he claimed was assaulting him. He stated that he had informed

- 15 -

the court of the abuse that he was experiencing as well as state
senators. No indication of mental disorder noted or observed.
Informed the ARUS of the inmate's allegations and she claimed that
she had heard this and did not believe the inmate and that he was
trying to win some money in a lawsuit.

(Defendants' Exhibit 1A, p. 186.)

On November 22, 2007, Plaintiff kited health services requesting a test for Hepatitis

because his eyes were yellow. (Defendants' Exhibit 1A, p. 188.) On November 23, 2007, Plaintiff

kited again, claiming that he had needle marks inside his left ear, that his eyes were yellow, and that

he had body fluids inside his rectum from being drugged and assaulted. Plaintiff further complained

of pain in his colon. Plaintiff requested testing for Hepatitis, AIDS and HIV. (Defendants' Exhibit

1A, p. 189.) Plaintiff's subsequent HIV and Hepatitis tests were negative. (Defendants Exhibit 1A,

pp. 190-91, 197.)

On December 3, 2007, Plaintiff complained that he was being injected with a needle

in his left ear, but that had healed up. Plaintiff stated that he had needle marks all over and body

fluids in his rectum. However, Nurse Mandi J. Salmi, R.N., did not observe any needle marks.

(Defendants' Exhibit 1A, p. 194.) On December 4, 2007, Plaintiff complained that he had pain in

his colon and requested a colonoscopy. (Defendants' Exhibit 1A, p. 195.) On December 14, 2007,

Plaintiff was seen by Psychologist Eyke, who reported:

**Subjective:**

"If you were smart, you would back the fuck up unless you want to
get caught up in this lawsuit. I would not say that I am delusional and
all that bullshit."

**Objective:**

Inmate seen cell front in response to HC272 referral and in response
to phone referral from Inspector regarding inmate's grievance
claiming that he was being injected with medications on the night

- 16 -

shift and then being sexually assaulted.  Inmate appeared in no acute distress.  He continues to make allegations that he is being assaulted on the night shift and referred to the Inspector as a "corrupt motherfucker." He stated many times to this writer to be careful what I wrote in his chart as it would likely end up in court and I would have to back up what I wrote about him.  He appeared to be alert, oriented and was generally cooperative. His speech was coherent and goal directed although his allegations do not appear to be that logical. His mood appeared to be irritable and his affect was congruent to mood.  No overt indications of perceptual disorder or formal thought disorder.  Inmate's allegations may be fodder for a lawsuit that he is in the process of filing.  His level of attention/concentration and immediate/remote memory all appeared to be intact.  Despite the inmate's allegations he does not present with any over indications of mental disorder.

(Defendants' Exhibit 1A, p. 204.)

On December 17, 2007, Plaintiff was seen by Dr. Fernando E. Frontera, M.D., regarding complaints about his colon.  Plaintiff did not display any acute symptoms, refused lab tests, would not cooperate for an abdominal exam, and told Frontera that he would see him in court. (Defendants' Exhibit 1A, p. 206.) On January 4, 2008, Plaintiff told Psychologist Eyke to be careful what he wrote because Plaintiff would file a grievance.  (Defendants' Exhibit 1B, p. 23.)  On January 7, 2008, Plaintiff was examined by Dr. Frontera, who noted that Plaintiff was uncooperative. In addition, Dr. Frontera stated that a repeat colonoscopy was required because of "excessive poor preparation, poor cooperation."  (Defendants' Exhibit 1B, p. 27.)

On January 17, 2007, Plaintiff was seen in the Emergency Department (ED).  Plaintiff claimed to have been sexually assaulted on January 16, 2007.  The ED report notes that Plaintiff has a history of putting razors up his rectum.  (Defendants' Exhibit 1B, p. 416.)  Plaintiff complained of "prostate pain," but Plaintiff's body showed no visible signs of assault.  (Defendants' Exhibit 1B, pp. 419-20.)  On August 25, 2008, Plaintiff was seen by Psychologist Eyke, who noted that Plaintiff denied any problems and stated that he was waiting on the outcome of his lawsuits.  (Defendants'

Exhibit 1B, p. 202.) On October 3, 2008, Psychologist Eyke noted that Plaintiff recently complained of being drugged and anally raped by staff. Plaintiff also denied being mentally ill and claimed to have filed lawsuits regarding this label. (Defendants' Exhibit 1B, p. 216.) On October 13, 2008, Eyke noted:

> [Plaintiff] continues to claim that he is being sexually assaulted after being drugged in his cell. It is unclear if this is the product of mental disorder or simply a ploy on the part of the inmate. No sign of mental disorder and inmate appeared to be in no acute distress.

(Defendants' Exhibit 1B, p. 218.)

On April 3, 2009, Plaintiff refused his annual physical examination. (Defendants' Exhibit 1B, p. 232.) On May 28, 2009, Plaintiff kited that he was being poisoned by staff and that there was an abnormal growth developing on his forehead as a result. Plaintiff requested a blood test in order to see what kind of poison was involved, as well as tests for HIV and any other STD. (Defendants' Exhibit 1B, p. 242.) On July 20, 2009, Plaintiff refused medication, and on August 5, 2009, Plaintiff refused his annual physical exam. (Defendants' Exhibit 1B, pp. 273, 281.) On September 21, 2009, Plaintiff was seen by Addie Briske, R.N., who reported:

> **Subjective:**
>
> "Well, they did a colonoscopy in 2008 and Dr. Tommy said I needed another one. He said my prostate was tore up from the officers raping me. Inmate states officers came into his cell late at night while he was sleeping and raped him on a number of occasions at different facilities in MDOC over a period of 9 years. Can not state why he would be targeted in this manner nor does he give an explanation as to why he never wakes up during assaults. "I just don't know." "Why are you asking me all these questions? It's all in my medical file. I have proof." Inmate begins listing actual dates of occurrences, but declines to repeat them when asked in order for HC to write them down. No C/O discharge, bleeding from rectum. Denies FB [foreign body] insertion —"Oh, no way. No."

(Defendants' Exhibit 1B, p. 314.)

On November 13, 2009, Plaintiff was evaluated by Psychologist Craig A. Derror, PhD, who reported:

**Objective:**

> Prisoner states that he has been sexually assaulted by officers in the past. States that he is in appeals court and hopes that they will let him out of prison early as a result of some type of settlement. Prisoner discusses "needle marks" and makes statements about being drugged and assaulted at multiple facilities. Review of record indicates that prisoner has made these allegations over the years and that the inspectors at the various facilities have found no merit to the charges.

> Prisoner focused on wanting to have a mental health contact to document his allegations. Reports to be functioning ok. States that he does not shower, but keeps himself clean via cleaning up in his cell. It is noted that the prisoner is well groomed and very clean in his presentation.

> Prisoner presents as calm and focused. He presents as oriented to person, place, date, and time. No distress noted.

(Defendants' Exhibit 1B, p. 329.)

Defendants state that although raping a prisoner would constitute a violation of the Eighth Amendment, there is absolutely no factual support for Plaintiff's claim that he was drugged and sexually assaulted by staff. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with

"deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

"[B]ecause the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and psychological harm, such abuse can, in certain circumstances, constitute the 'unnecessary and wanton infliction of pain' forbidden by the Eighth Amendment." *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997) (quoted cases omitted). "To prevail on a constitutional claim of sexual harassment, an inmate must therefore prove, as an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind." *Freitas*, 109 F.3d at 1338 (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

The undersigned notes that although Plaintiff's allegations of being drugged and raped state a claim under the Eighth Amendment, Defendants have succeeded in showing that there is no genuine issue of material fact with regard to Plaintiff's claims. Plaintiff fails to come forward with any additional facts in support of his claims, merely asserting that there is an issue of fact. An unsupported affidavit that is contradicted by other evidence does not create a genuine issue of material fact sufficient to survive a summary judgment motion. *Smit v. Meyer*, 2012 WL 499643, slip op. *2 (6th Cir. Feb. 16, 2012) (*citing Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993)).

As set forth above, Plaintiff's records show that he has made numerous allegations over the years with regard to alleged sexual assaults, all with the same or similar set of

circumstances.  These allegations have been investigated and no evidence has been found in support of any of Plaintiff's claims.  Psychological evaluations have determined that Plaintiff has suffered from a Delusional Disorder, Paranoid Personality Disorder, Antisocial Personality Disorder, and Malingering.  Plaintiff has refused to participate in any plan or "sting" operation to catch staff drugging and assaulting him.  Plaintiff has washed away alleged evidence of assault prior to making a complaint.  Plaintiff has also been uncooperative when asked about the circumstances surrounding the alleged assaults in any detail.  Plaintiff has responded by stating that Defendants have not met their burden, but has failed to come forward with any additional support for his claims.  As stated above, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52.  Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  The undersigned concludes that a review of the entire record in this case shows that there is no genuine issue of material fact regarding Plaintiff's assault claims and that Defendants are entitled to summary judgment.

Defendants alternatively move for qualified immunity.  Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful.  *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.* As previously discussed, because Plaintiff cannot establish that his constitutional rights were violated, Defendants are entitled to qualified immunity.

Finally, Defendants Derusha and Patrick assert that Plaintiff's claims against them are barred by the statute of limitations. State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983. *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985). For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* MICH. COMP. LAWS § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir.1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). Accrual of the claim for relief, however, is a question of federal law. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer*, 98 F.3d at 220.[2]

---

[2]28 U.S.C. § 1658 created a "catch-all" limitations period of four years for civil actions arising under federal statutes enacted after December 1, 1990. The Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which applied this federal four-year limitations period to a suit alleging racial discrimination under § 1981 does not apply to prisoner claims under 28 U.S.C. § 1983 because, while § 1983 was amended in 1996, prisoner civil rights actions under § 1983 were not "made possible" by the amended statute. *Id.* at 382.

According to his amended complaint, Plaintiff's claims against Defendants Derusha and Patrick arose on September 23, 2007.  Plaintiff filed his original complaint in this case on September 24, 2010.  Plaintiff's complaint was signed and dated on September 17, 2010.  (Docket #1.)  Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  For purposes of this report and recommendation, the undersigned has given Plaintiff the benefit of the earliest possible filing date. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).  Therefore, Plaintiff's claims against Defendants Derusha and Patrick are not barred by the statute of limitations.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' Motions for Summary Judgment.  Accordingly, it is recommended that Defendants' Motions for Summary Judgment (docket #34 and #80) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal.  Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  February 24, 2012

- 24 -